UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

DeANDRE JEROME BARNES,

        Plaintiff,

v.

MINNESOTA DEPARTMENT OF
CORRECTIONS, TOM ROY, BRUCE
REISER, GREG SMITH, JEANETTE
WILSON, and VIRGINIA MANDAC,

        Defendants.

Civil No. 11-2534 (JNE/AJB)

**REPORT AND RECOMMENDATION**

---

DeAndre Jerome Barnes, Minnesota Correctional Facility - Stillwater, 970 Pickett Street North, Bayport, Minnesota, 55003, Plaintiff, pro se.

Margaret E. Jacot, Assistant Minnesota Attorney General, 445 Minnesota Street, Suite 900, St. Paul, Minnesota, 55101, for Defendants Minnesota Department of Corrections, Tom Roy, Bruce Reiser, Greg Smith, and Jeanette Wilson.

Attorneys Andrea P. Hoversten and Charles A. Gross, Geraghty, O'Loughlin, and Kenny, P.A., Alliance Bank Center, Suite 1100, 55 East Fifth Street, St. Paul, Minnesota, 55101, for Defendant Virginia Mandac.

---

ARTHUR J. BOYLAN, Chief Magistrate Judge

The above-named Plaintiff, DeAndre Jerome Barnes, is a Minnesota state prison inmate. He commenced this action by filing a complaint seeking relief under 42 U.S.C. § 1983 for alleged violations of his federal constitutional rights. Defendants have filed motions asking to have this action dismissed, or to be granted summary judgment.[1] Those

---

[1] Defendant Virginia Mandac is the only Defendant in this case who is not an agency or employee of the State of Minnesota. She is represented by private counsel, and she has filed her own motion to dismiss or for summary judgment. The remaining Defendants are represented by the Minnesota Attorney General, and they have filed a separate motion. The two motions raise similar defenses, and will be discussed together.

motions have been fully briefed by the parties, and the matter has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court will recommend that Defendants' motions for summary judgment be granted, and this action be dismissed with prejudice.

## I. BACKGROUND

Plaintiff is serving a 450-month prison sentence that was imposed in November 2000, after he pleaded guilty to second degree murder in the state district court for Hennepin County, Minnesota. See State v. Barnes, No. C4-00-2094 (Minn.App. 2001), 2001 WL 826883 (unpublished opinion) at *1.[2] Plaintiff has been incarcerated by the Minnesota Department of Corrections, ("DOC"), since November 8, 2000. (Affidavit of Kobie Hudson, [Docket No. 70], ¶ 2.) From November 2003 until the end of February 2012, Plaintiff was held at the Minnesota Correctional Facility in Rush City, Minnesota, ("MCF-RC"). (Id.) On February 29, 2012, he was transferred to the Minnesota Correctional Facility at Stillwater, Minnesota, and he is still at that facility at this time. (Id.)

During Plaintiff's first three years in prison, (approximately November 2000 to November 2003), he received medical attention for a variety of ailments. By January of 2001, he was already taking Zantac and Maalox for "gastroesophageal reflux disease," ("GERD"). (Affidavit of David A. Paulson, ["Paulson Aff."], Exhibit I, [Docket No. 65].) Plaintiff also presented complaints involving "sore heels," "itchiness in the pubic region and also in the hair," too much sunlight, possible ingestion of broken glass in spaghetti, "burning

---

[2] After Plaintiff was convicted and sentenced, he filed a direct appeal "arguing that the district court erred in denying his motion to withdraw his guilty plea because he did not understand that he would actually serve 25 years in prison and was delusional at the time he entered his plea." Barnes, 2001 WL 826883 (unpublished opinion) at *1.

on urination," and unidentified psychiatric issues. (Id.) Plaintiff's medical records indicate that when he arrived at MCF-RC in November 2003, he was still taking Zantac for "heartburn/reflux," and he had a history of "psychiatric disorder," but was "on no meds at this time." (Plaintiff's Exhibits, [Docket No. 3], p. 6.)

In January 2004, Plaintiff fell out of his bunk at MCF-RC. His medical records indicate that when he was examined after the fall, he "showed no facial expression of pain," he "was able to move legs /s difficulty," and although he asked to be seen by a doctor, he also laughed "multiple times" during the examination. (Id., pp. 6-7.) During the next several months thereafter, Plaintiff occasionally complained about pain in his side. In December 2004, he was given a chest x-ray, which showed a "possible fracture of the ninth rib laterally, which is in the area of his pain." (Id., p. 9.) A prison doctor informed Plaintiff that he should be "completely healed" if the fracture was from the fall that had occurred nearly a year earlier. (Id.)

Over the course of the next few years, (approximately 2005 to 2008), Plaintiff received medical attention from the medical staff at MCF-RC on multiple occasions. He was treated primarily for continuing gastroesophageal reflux problems, irregular bowel movements, and various subjective complaints of chest pain and abdominal pain.

On August 15, 2008, Plaintiff was examined by Defendant Virginia Mandac, a medical doctor employed by Corizon, Inc., (f/k/a Correctional Medical Services, Inc.). (Affidavit of Virginia Mandac, M.D., ["Mandac Aff."], [Docket No. 42], ¶s1-4.) Corizon, Inc. provides medical services to Minnesota state prison inmates pursuant to a contract with the DOC. (Paulson Aff., ¶ 3.) Corizon, Inc. hired Dr. Mandac to provide health care services to inmates at MCF-RC. (Mandac Aff., ¶ 3.)

When Dr. Mandac examined Plaintiff in August 2008, he was complaining of "radiating chest pain, right sided lumbar pain, and gastroesophageal reflux disease." (Id., ¶ 4.) Dr. Mandac learned that Plaintiff "frequently works out and does bench presses," and she noted that he had "normal heart sounds" and "clear lung sounds." (Id.) Her diagnosis was "musculoskeletal chest pain and GERD," for which she prescribed Ibuprofen and Zantac. (Id.) Dr. Mandac also noted that Plaintiff's blood pressure was somewhat high, ("154/84"), so she also recommended "blood pressure checks twice a week to rule out hypertension." (Id.)

The next time Dr. Mandac examined Plaintiff was February 7, 2011. (Id., ¶ 5.) At that time, Plaintiff was complaining about a "burning sensation while urinating." (Id.) Although Plaintiff expressed concern about sexually transmitted disease, ("STD"), he declined to be tested. (Id.) Less than two weeks later, Plaintiff returned to Dr. Mandac and "reported that he was currently experiencing dribbling of urine without pain or burning." (Id., ¶ 6.) He asked to be tested for Chlamydia and Gonorrhea, and those tests were ordered. (Id.) During another examination in March 2011, Dr. Mandac informed Plaintiff that his test results were negative. (Id., ¶ 7.) In April 2011, Plaintiff was tested for hepatitis C and HIV, and those tests were also negative. (Plaintiff's Exhibits, p. 13.)

When Dr. Mandac examined Plaintiff in February and March 2011, she reviewed his recent blood pressure readings. She continued to be concerned about his "borderline" hypertension, and counseled him "to do cardio exercises and limit his salt," and continue weekly blood pressure checks." (Mandac Aff., ¶ 7.)

In early May 2011, Plaintiff was examined by a physician's assistant, ("PA"), because he was again complaining about abdominal pain. Plaintiff told the PA he felt "a

tightness in the left upper quadrant," which dissipated when he cleared his throat. (Plaintiff's Exhibits, p. 32.) Plaintiff said the pain "typically lasts all day long but it is worse if he does not have a bowel movement and does tend to be more tolerable for the rest of the day after a bowel movement." (Id.) Plaintiff told the PA that he thought he was "bleeding internally," and he asked for tests, including an x-ray. (Id.) The PA examined Plaintiff and found that his "vitals are normal," "[h]e is without any obvious signs of distress," his "[l]ungs are clear to auscultation," and his heart had a "regular rate and rhythm." (Id.) The PA also noted that Plaintiff "mention[ed] seeing mental health regarding anxiety." (Id.) Plaintiff agreed to have a rectal examination and "Hemoccults" to find out more about his abdominal pain. (Id.)

Approximately two weeks later, (May 18, 2011), Plaintiff had another appointment with Dr. Mandac. On that occasion, Dr. Mandac noted that a "hemoccult showed blood in his stool," and she therefore referred Plaintiff to a specialist for a colonoscopy. (Mandac Aff., ¶ 8; Paulson Aff., ¶ 13.) The colonoscopy, which was performed in July 2011, showed that Plaintiff had "mild, non-bleeding external [and] internal hemorrhoids," but the results were "otherwise normal." (Mandac Aff., ¶ 10.) On July 28, 2011, Dr. Mandac talked to Plaintiff about the results of the colonoscopy. Even though the results of the colonoscopy were "normal," (other than confirming hemorrhoids), Plaintiff still "complained of pain in his stomach and was worried about stomach cancer." (Id.) Dr. Mandac reassured him that, given his colonoscopy results and the lack of apposite symptoms, his cancer fears appeared to be unfounded. (Id.) Dr. Mandac noted that Plaintiff had abdominal scarring related to a previous gunshot wound, and she concluded that Plaintiff's continuing abdominal pain, "was associated with adhesions from the previous laparotomy surgery

[related to the gunshot wound] and the internal and external hemorrhoids per the colonoscopy." (Id.) Dr. Mandac prescribed "Colace 100 mg twice a day to make sure the stool was soft so the hemorrhoids would not bleed." (Id.)

In early August, Plaintiff was given additional blood and urine tests. (Plaintiff's Exhibits, pp. 18-19.) The tests were essentially normal, with the exception of one component of the urine test, ("serum glutamic oxaloacetic transaminase"), which was outside of the normal range. (Id.; Paulson Aff., ¶ 12.) Because of the one aberrational component of the original urine test, Plaintiff was given a follow-up test. On that later test, the previously aberrant component was normal. (Plaintiff's Exhibits, p. 30; Paulson Aff., ¶ 12.)

On or about August 9, 2011, Plaintiff gave his prison caseworker a written grievance, which presented complaints about his health care at MCF-RC. (Plaintiff's Exhibits, p. 23.) He stated that he had been complaining about "pain on left and right side of body" since February 2011, and that it presently "feels like something is busted on right side and it feels like I am leaking fluid." (Id., p. 22.) Plaintiff further reported that blood had been detected in his urine and stool, but "no steps or exams were made to verify that there is no internal bleeding." (Id.) He claimed that the blood and urine tests conducted on August 2, 2011, showed "symptoms of kidney disease." (Id.) Plaintiff also stated in his grievance that he "felt dizzy, weak, and I had a pain in my heart," and he requested "further exams such as an x-ray of my kidneys." (Id.) Plaintiff also asked for "10 days medical leave," "an administrative job change," and that he "be considered for special needs." (Id.)

Plaintiff's grievance was addressed by Defendant Jeanette Wilson, a registered

nurse who is the Health Services Administrator at MCF-RC. (Affidavit of Jeanette Wilson, ["Wilson Aff."], [Docket No. 66], ¶ 1.) On or about August 25, 2011, Wilson informed Plaintiff that --

> "You have been seen several times by the doctor and all tests have shown no further follow-up is necessary. The results have been discussed with you as well. You have been instructed to sign up for sick call should you experience an issue that requires medical attention."

(Plaintiff's Exhibits, p. 22.)

About a week after Plaintiff received Wilson's response to his grievance, he filed his current lawsuit.

## II. PLAINTIFF'S CLAIMS

Plaintiff has named six Defendants in his complaint – the DOC, Dr. Mandac, and Jeanette Wilson, plus three other non-medical prison administrators – (1) Tom Roy, the current Commissioner of the DOC, (2) Bruce Reiser, the Warden at MCF-RC from September 16, 2009, until December 2, 2011, and (3) Gregory Smith, the Associate Warden of Operations at MCF-RC since October 28, 2009. Plaintiff claims that Defendants have violated his federal constitutional rights under the Eighth Amendment.[3]

---

[3] Plaintiff's submissions include two or three vague references to "negligence" and "malpractice," which might conceivably suggest that he was attempting to bring a state common law tort claim for medical malpractice, in addition to his Eighth Amendment claims. Dr. Mandac – apparently acting with an abundance of caution – has argued that Plaintiff has failed to plead an actionable medical malpractice claim, because he has not complied with certain requirements prescribed by Minnesota state law. Plaintiff did not address this argument in his reply memorandum, but instead argued that "Minnesota may not impair Federally created rights or impose conditions upon them. ("Plaintiff's Reply To The Defendants Motion to Dismiss and Summary Judgment," [Docket No. 73], p. 32.) This response to Mandac's argument appears to confirm that Plaintiff is not attempting to bring a state common law malpractice claim, but rather, his claims are based solely on federal law – namely 42 U.S.C. § 1983 and the Eighth Amendment to the Constitution. In any event, it is readily apparent that Plaintiff has failed to plead an actionable claim for medical

Plaintiff alleges in his complaint[4] that –

* he has "signs and symptoms [that] are identical to Polycystic Kidney disease," (Complaint, [Docket No. 1], p. 6, ¶ 29);

* he has GERD, (id., p. 6, ¶ 30);

---

malpractice, because (as Defendant Mandac correctly contends) he has not complied with applicable Minnesota state law.

Minn.Stat. § 145.682 requires that every plaintiff in a Minnesota medical malpractice case must furnish two affidavits in support of his or her claims. These two affidavits have been described as follows:

> "The first affidavit ('expert review affidavit') must be submitted with the complaint and state that before commencing the lawsuit, plaintiff's attorney reviewed the facts of the case with a medical expert who believed that at least one defendant named in the suit deviated from the applicable standard of care and thereby injured the plaintiff....
>
> The second affidavit ('expert disclosure affidavit') must be served upon the defendant within 180 days after commencement of the suit and identify each expert plaintiff intends to call at trial, disclose the substance of the facts and opinions to which the expert will testify, and provide a summary of the grounds for each opinion."

Bellecourt v. United States, 784 F.Supp. 623, 636 (D.Minn. 1992), aff'd 994 F.2d 427 (8th Cir. 1993), cert. denied, 510 U.S. 1109 (1994). If a medical malpractice complainant fails to meet either one of the two affidavit requirements set forth in § 145.682, the statute provides for "mandatory dismissal." Minn.Stat. § 145.682, subd. 6; Stroud v. Hennepin County Medical Center, 556 N.W.2d 552 (Minn. 1996); Lindberg v. Health Partners, Inc., 599 N.W.2d 572 (Minn. 1999). Plaintiff has not complied with Minn.Stat. § 145.682, because he has not filed the affidavits required by that statute. Therefore, Plaintiff has failed to state an actionable medical malpractice claim.

[4] The Court previously determined that Plaintiff's complaint in this case consists of two parts – the original complaint that was filed on September 2, 2011, (Docket No. 1), and a handwritten supplemental pleading entitled "Amendent [sic] Complaint," which was filed on September 16, 2011, (Docket No. 10). As explained in the Court's order dated October 11, 2011, (Docket No. 17), (at p. 2), "[s]ince a pro se plaintiff is owed a liberal reading of his pleadings to account for his lack of legal training..., the Court will consider [Plaintiff's] original pleading and his amended complaint as one document for the purposes of moving the litigation forward."

* he has "fluid on right side" and blood in his stools and urine, (id., p. 8, ¶ 37);

* he has had lab results showing that he "may have liver or kidney disease," (id.);

* he has high blood pressure, (id.);

* he might have "something wrong" with his bladder or prostate, (id., p. 13, ¶ 89);

* he has felt dizzy, weak and pain in his heart, (id., p. 14, ¶ 97);

* he has "permanent pain on both sides of his abdomen," as well as "scare [sic] tissue and internal damage, internal bleeding and frequent headaches," (id., p. 14, ¶ 102); and

* he "is in severe pain and will die any day," (id., p. 16, ¶ 104).[5]

Plaintiff claims that Defendants have violated his federal constitutional rights under the Eighth Amendment, because they have deliberately ignored all of the various maladies described in his complaint.[6] Two of the named Defendants, Dr. Mandac and Jeanette Wilson, are health care providers who actually rendered medical care and treatment to Plaintiff while he was incarcerated at MCF-RC. Plaintiff claims that these two Defendants violated his Eighth Amendment rights, because they did not provide him with the care and treatment that he needed for the various maladies described in his complaint. Plaintiff claims that the remaining Defendants, who are not professional health care providers,

---

[5] Although Plaintiff alleged on August 31, 2011, that he "will die any day," a website maintained by the DOC indicates that he is still quite alive more than eighteen months later.

[6] Plaintiff has also alleged that when he fell out of his bunk in 2004, he "suffered a broken rib," and "reported severe pain in his side and head," for which he "urgently needed emergency medical treatment." (Complaint, p. 6, ¶ 31.) However, Plaintiff has not alleged any facts suggesting that any of the named Defendants had any involvement in that incident. Furthermore, as Defendants have correctly asserted, any claims based on that incident became time-barred long before Plaintiff filed his current complaint.

violated his Eighth Amendment rights, because they failed to ensure that Plaintiff was receiving the medical attention that he needed, and they did not adequately train and supervise Defendants Mandac and Wilson.

Defendants have filed motions seeking to have Plaintiff's lawsuit dismissed, because his complaint is legally insufficient, or in the alternative, on summary judgment. The Court finds that Defendants are entitled to summary judgment in this case, for the reasons discussed below.

## III. STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate if the materials submitted in support of the motion "show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The standards for considering a motion for summary judgment are prescribed by Rule 56 of the Federal Rules of Civil Procedure, as interpreted in a trilogy of cases decided by the Supreme Court in 1986. In one of those cases, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986), the Supreme Court described the importance of the summary judgment procedure:

> "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' . . . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."

On a motion for summary judgment, the moving party has the initial burden of

establishing the "material facts" and demonstrating that there is not a "genuine" dispute as to whether those material facts are true. Fed. R. Civ. P. 56(c). To defeat the motion, the opposing party must then establish that there is a "genuine" issue as to material facts.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e). If a motion for summary judgment is properly supported by affidavits or other evidence, the nonmoving party must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. Id. at 587; Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 585 (8th Cir. 1987), cert. denied, 484 U.S. 1010 (1988). Although the evidence is examined in the light most favorable to the non-moving party, the non-moving party may not rely on conclusory allegations or denials. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Lambert v. City of Dumas, 187 F.3d 931, 934-35 (8th Cir. 1999).

The moving party is entitled to summary judgment when the non-movant fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. Celotex Corp., 477 U.S. at 322. No genuine issue of material fact exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587. The Court considers the motion for summary judgment based upon the

material presented in connection with the motion. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

The Court's inquiry should be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. "A properly supported motion for summary judgment is not defeated by self-serving affidavits." Frevert v. Ford Motor Co., 614 F.3d 466, 473 (8th Cir. 2010) (quoting Bacon v. Hennepin Cnty Med. Ctr., 550 F.3d 711,716 (8th Cir. 2008)). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Id. at 473-74.

The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

The Court is mindful that pro se pleadings should be liberally construed. Haines v. Kerner, 404 U.S. 519, 520 (1972); White v. Bond, 720 F.2d 1002, 1003 (8th Cir. 1983). Therefore, pro se pleadings are held to less stringent standards when challenged by motions to dismiss or for summary judgment. Haines, 404 U.S. at 520; Horsey v. Asher, 741 F.2d 209, 211 n.3 (8th Cir. 1984). Nevertheless, even a pro se party who opposes

summary judgment "is not permitted to merely rest on his pleadings but must instead set forth sufficient evidence from which a reasonable jury could find in his favor on all elements of his claims." Johnson v. Hamilton, 452 F.3d 967, 972 (8th Cir. 2006).

## IV.  DISCUSSION

A. Claims Against The DOC

The Court initially finds that all of Plaintiff's claims against the DOC must be summarily dismissed, because the DOC is a state agency that is immune from suit in federal court.  The Eleventh Amendment provides that states and their agencies are immune from suit in federal court, unless the state has consented to be sued, or Congress has abrogated the state's immunity by some express statutory provision. Pugh v. Alabama, 438 U.S. 781, 782 (1978) (per curiam); Will v. Michigan Dept. of State Police, 491 U.S. 58, 66-67 (1989); Egerdahl v. Hibbing Community College, 72 F.3d 615, 619 (8th Cir. 1995). Eleventh Amendment immunity is fully applicable to state agencies, such as the DOC.  See Glick v. Henderson, 855 F.2d 536, 540 (8th Cir. 1988) ("an injunction against the Arkansas Board of Corrections would be unconstitutional without the state's consent as 'the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies'") (quoting Pugh, 438 U.S. at 781); Creek v. South Dakota Dept. of Corrections, 33 Fed.Appx. 250, 251 (8th Cir. 2002) (per curiam) (unpublished opinion) (state prisoner's § 1983 action was properly dismissed on § 1915A review, because "the only named defendants – the South Dakota Department of Corrections and the South Dakota State Penitentiary – are entitled to Eleventh Amendment immunity").

It is well settled that Congress did not abrogate the states' Eleventh Amendment immunity when it enacted 42 U.S.C. § 1983.  Will, 491 U.S. at 66-67, Quern v. Jordan, 440

U.S. 332, 341-45 (1979). Furthermore, there is no indication that Defendant DOC has waived its immunity and consented to be sued in this case. Thus, the Court finds that the DOC is constitutionally immune from Plaintiff's present lawsuit, and the Court will accordingly recommend that the DOC be granted summary judgment on all of Plaintiff's claims.

      B. <u>Eighth Amendment Claims Under 42 U.S.C. § 1983</u>

      42 U.S.C. § 1983 authorizes individuals, (including prisoners), to seek relief against persons acting under state law, (including state correctional officials), who allegedly have violated the constitutional rights of the individual seeking relief. <u>Nelson v. Campbell</u>, 541 U.S. 637, 643 (2004) ("[s]ection 1983 authorizes a 'suit in equity, or other proper proceeding for redress,' against any person who, under color of state law, 'subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution'"). <u>See</u> <u>also</u> <u>Moore v. City of Desloge, Mo.</u>, 647 F.3d 841, 846 (8th Cir. 2011) (§ 1983 "authorizes a private right of action against those who, under color of law, deprive a citizen of 'any rights, privileges, or immunities secured by the Constitution and laws'"). To state an actionable § 1983 claim, a plaintiff must allege a set of facts showing that the named defendant(s) violated his constitutional rights while acting under color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). <u>See</u> <u>also</u> <u>Youngblood v. Hy-Vee Food Stores, Inc.</u>, 266 F.3d 851, 855 (8th Cir. 2001) ("[o]nly state actors can be held liable under Section 1983"), <u>cert</u>. <u>denied</u>, 535 U.S. 1017 (2002).


      In this case, Plaintiff is claiming that the individual Defendants are state actors who violated his constitutional rights under the Eighth Amendment, because they did not provide

14

him with proper medical care and treatment while he was confined at MCF-RC.[7]   A prison

official can be liable for violating a prisoner's Eighth Amendment rights if the official has

acted with "deliberate indifference" to the prisoner's "serious medical needs."  Estelle v.

Gamble, 429 U.S. 97, 105 (1976).

The Eighth Circuit Court of Appeals has explained that --

"An Eighth Amendment claim that prison officials were deliberately indifferent
to the medical needs of inmates involves both an objective and a subjective
component....  [P]laintiffs must demonstrate (1) that they suffered objectively
serious medical needs and (2) that the prison officials actually knew of but
deliberately disregarded those needs."

Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citations omitted).

"A prison official exhibits deliberate indifference when the official actually 'knows of

and disregards' a prisoner's serious medical needs."  Boyd v. Knox, 47 F.3d 966, 968 (8th

Cir. 1995, quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994).  See also Mays v.

Rhodes, 255 F.3d 644, 649 (8th Cir. 2001) ("[d]eliberate indifference requires proof that [the

prisoner-plaintiff] suffered objectively serious medical needs and that the [defendants]

actually knew of these needs but deliberately disregarded them").  "[D]eliberate indifference

requires a highly culpable state of mind approaching actual intent."  Choate v. Lockhart, 7

F.3d 1370, 1374 (8th Cir. 1993).

"Medical malpractice alone... is not actionable under the Eighth
Amendment....  [Citation omitted.]  For a claim of deliberate indifference, 'the
prisoner must show more than negligence, more even than gross negligence,

---

[7] Defendant Mandac is not employed by the State of Minnesota.  She is employed
by Corizon, Inc., a private company that has contracted with the DOC to provide medical
care to Minnesota prison inmates.  (Mandac Aff., ¶ 3.)  Although Mandac is not a state
employee, she does not deny that she can properly be treated as a "state actor" for § 1983
purposes.  See West, 487 U.S. at 55 (a physician who contracts with a state to provide
medical care to prisoners is a state actor for § 1983 purposes).

and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'"

Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008), quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995).

A prisoner cannot maintain an Eighth Amendment deliberate indifference claim simply because he disagrees with his medical treatment. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) ("mere disagreement with treatment decisions does not rise to the level of a constitutional violation'"), quoting Estate of Rosenberg, 56 F.3d at 37. See also Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (prisoner's Eighth Amendment claims were properly dismissed on summary judgment because they were based on "nothing more than mere disagreement with the course of his medical treatment").

As the Court of Appeals explained in Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996):

"[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment. White v. Farrier, 849 F.2d 322, 327 (8th Cir. 1988). Prisoners do not have a constitutional right to any particular type of treatment. See id. at 327-28. Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment. Taylor v. Turner, 884 F.2d 1088, 1090 (8th Cir. 1989); Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994)."

With these standards in mind, the Court has reviewed the various claims of deliberate indifference that Plaintiff is attempting to bring against the five individual Defendants in this case – Dr. Mandac, Jeanette Wilson, Tom Roy, Bruce Reiser, and Greg Smith. Having carefully examined the record in this case, the Court finds that Plaintiff cannot prove that any of the named Defendants violated his Eighth Amendment rights. The record does not show any act or omission by any of the Defendants that could constitute "deliberate indifference" to Plaintiff's medical needs.

### (i) Claims Against Health Care Professionals

Dr. Mandac appears to be the primary target of Plaintiff's Eighth Amendment claims. Plaintiff obviously believes that Dr. Mandac did not correctly evaluate and treat the various medical concerns that he presented to her while he was at MCF-RC. He thinks that Dr. Mandac should have done more to identify the true nature and causes of the various ailments described in his complaint, and she should have done more to treat those ailments.

However, Plaintiff's Eighth Amendment claims against Dr. Mandac are belied by the evidentiary record in this case. The record plainly shows that Dr. Mandac did <u>not</u> deliberately ignore Plaintiff's medical concerns. She evaluated Plaintiff's medical conditions, and provided him with the care that she thought he needed.

When Plaintiff came to Dr. Mandac in August 2008 complaining of chest pain, lumbar pain and GERD, she listened to his heart and lungs and found no abnormalities. She noted that his blood pressure was elevated, and she recommended a program for monitoring his blood pressure. She acknowledged his back pain and GERD, and prescribed Ibuprofen and Zantac. (Mandac Aff., ¶ 4.)

Plaintiff came to Dr. Mandac in February 2011, with complaints about a "burning sensation when urinating," and "dribbling of urine." (<u>Id</u>., ¶s 5-6.) Dr. Mandac discussed the possibility of testing Plaintiff for STDs. Plaintiff initially rejected that suggestion, but when he later agreed to it, Dr. Mandac approved the necessary tests, and confirmed that Plaintiff did not have Chlamydia, Gonorrhea, or HIV. (<u>Id</u>., ¶s 5-7.) Dr. Mandac also noted that Plaintiff's blood pressure was still elevated, and that he had not complied with the monitoring program that she had previously recommended. (<u>Id</u>., ¶ 6.) She opined that

Plaintiff's blood pressure reading might have been associated with anxiety, and she encouraged him to limit his salt intake, do cardio exercises, and resume weekly blood pressure tests. (Id., ¶ 7.)

Dr. Mandac also ordered a urinalysis for Plaintiff, and when the initial urinalysis showed a "trace of lysed blood," Dr. Mandac ordered a follow-up test. (Id. ¶ 6.) Dr. Mandac also ordered a "hemoccult," presumably to see whether that would shed any light on Plaintiff's complaints about abdominal pain. When the hemoccult showed "blood in his stool," Dr. Mandac ordered another follow-up test – this time a colonoscopy. (Id. ¶ 8.) The colonoscopy showed that Plaintiff had hemorrhoids, (which apparently explained the blood in his stool found on the hemoccult), but was otherwise "normal." (Id., ¶ 9.) Despite the benign results of the colonoscopy, Plaintiff expressed concerns about having stomach cancer. (Id., ¶ 10.) Dr. Mandac listened to Plaintiff's stomach, and found "bowel sounds were normal." (Id.) She also noted that Plaintiff had a scar on his abdomen from a previous surgery. Dr. Mandac explained to Plaintiff why it was "not likely" that he had stomach cancer, and she opined that his abdominal pain probably was related to his previous surgery, and his hemorrhoids. Plaintiff was given a prescription for Colace, which was intended to alleviate his hemorrhoids. (Id.)

Dr. Mandac has shown that she consistently provided medical care to Plaintiff for all of his various health concerns. Dr. Mandac has stated under oath that she "listened to his complaints, evaluated him, ordered appropriate testing, and prescribed reasonable treatments," and that the care and treatment she provided to Plaintiff was "reasonable and appropriate." (Id., ¶ 13.) Plaintiff obviously disagrees with that assessment. He believes that Dr. Mandac should have ordered additional tests, and she should have referred him

18

to "specialists" for additional examinations. However, Plaintiff has offered <u>no evidence</u> whatsoever to support his opinions. He has offered only his own subjective belief that the medical care he received from Dr. Mandac was inadequate. That is not enough to survive summary judgment. Plaintiff's mere disagreement with Dr. Mandac's medical decisions does not substantiate his claim of deliberate indifference. <u>Jolly</u>, <u>supra</u>; <u>Smith</u>, <u>supra</u>. "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she [or he] did not feel she received adequate treatment." <u>Dulany</u>, 132 F.3d at 1240.

Furthermore, Dr. Mandac's motion for summary judgment, unlike Plaintiff's opposition to the motion, is supported by medical evidence, (in addition to her own medical opinions). Dr. David Paulson, a licensed physician employed as the DOC Medical Director, has furnished an affidavit that provides a comprehensive assessment of Plaintiff's medical care at MCF-RC. Dr. Paulson's affidavit provides compelling support for Dr. Mandac's summary judgment motion, and compelling refutation of Plaintiff's Eighth Amendment claim.

Dr. Paulson confirms that Plaintiff's "recent blood tests and urinalyses have consistently registered within normal limits." (Paulson Aff., ¶ 11.) He has acknowledged that there have been some "minor abnormalities" in some of Plaintiff's test results, but he has also thoroughly explained why Dr. Mandac's response to those results was medically appropriate. Indeed, Dr. Paulson's affidavit provides a very complete analysis of Plaintiff's medical records, and a very persuasive endorsement of the medical care Plaintiff received

at MCF-RC.  (Id., ¶s 12-33, 36.[8])  Plaintiff has not made any effort to refute any of the evidence provided by Dr. Paulson's affidavit.[9]

Again, the Court finds that the evidentiary record in this case clearly shows that Dr. Mandac did <u>not</u> deliberately disregard any of Plaintiff's serious medical needs.  To the contrary, the record shows that Dr. Mandac duly evaluated Plaintiff's medical concerns, and rendered care that was reasonable and appropriate.  Plaintiff believes that Dr. Mandac's medical treatment was inadequate in several respects, but he has offered no evidence that could give rise to any genuine issue of material fact.  Based on the current evidentiary record, no reasonable jury could conclude that Dr. Mandac was deliberately indifferent to Plaintiff's serious medical needs.  Therefore, Dr. Mandac is entitled to summary judgment on Plaintiff's Eighth Amendment claims against her.

The Court further finds that Defendant Jeanette Wilson is equally entitled to summary judgment on Plaintiff's Eighth Amendment claims against her.  Plaintiff claims that Defendant Wilson was deliberately indifferent to his serious medical needs on several

---

[8]  The Court considered whether Dr. Paulson's affidavit should be quoted at length, because it provides such a detailed explication of Plaintiff's medical concerns, how those concerns were addressed, why Plaintiff's medical care was adequate, and why additional testing and treatment were not warranted.  However, the affidavit is 23 pages long.  It also would be difficult to extract just the highlights of the affidavit, because Dr. Paulson's entire narrative presents an effective point-by-point refutation of Plaintiff's allegations.  Although the affidavit will not be reproduced here, it should be noted that it is very thorough, and very persuasive.

[9]  Much of Plaintiff's "Reply" to Defendants' motions is just a verbatim repetition of the allegations presented in his complaint; and a good share of what actually is original in Plaintiff's Reply is a counter-argument against an imaginary defense of "failure to exhaust administrative remedies."  (See DOC Defendants' Reply Memorandum, [Docket No. 76], p. 3, n. 2 (confirming that "[t]he DOC Defendants did not argue that Barnes failed to exhaust remedies").)  Plaintiff has not addressed the Paulson Affidavit at all.

occasions, but the evidentiary record disproves those claims.

Plaintiff alleges that Wilson failed to transport him to the hospital at any time during the year before he filed his complaint – i.e., between September 1, 2010, and August 31, 2011. (Complaint, p. 7, ¶ 32.) However, Plaintiff has not identified any specific occasion during that time frame when he actually needed to be hospitalized. Moreover, the evidentiary record shows that during that time frame, Plaintiff's medical needs were adequately addressed by the medical staff at MCF-RC. (Mandac Aff., ¶s 5-13; Paulson Aff., ¶s 10, 16-17, 19, 24, 26-30, 32.) The record also shows that Wilson had no authority to "order a referral to an off-site specialist," (Wilson Aff., ¶ 2), which presumably means that, absent a true emergency, Wilson could not have ordered that Plaintiff be transported to a hospital without directions from someone else, i.e., a doctor or some other authorized prison official.

Plaintiff also alleges that in August 2011, Wilson ignored lab results that "suggest[ed] chronic kidney disease," and Wilson wrongly denied Plaintiff's requests for "further exams such as an x-ray of [his] kidneys." (Complaint, p. 14, ¶s 97-99; see also Complaint, p. 16, ¶ 104.) These allegations are also belied by the record. Wilson has stated that she reviewed the concerns Plaintiff expressed in August 2011, and she learned that Plaintiff's physician (Dr. Mandac) had concluded that Plaintiff's "test results did not show any clinically significant abnormalities that would indicate a need for follow-up testing." (Wilson Aff., ¶ 8.) Dr. Paulson has reviewed Plaintiff's medical records through (and after) August 2011, and he has found that Plaintiff did not appear to have kidney disease, and did not appear to require any further medical tests. (Paulson Aff., ¶s 16 and 24.) Plaintiff has offered no evidence to contradict the medical evidence furnished by Dr. Mandac, Dr. Paulson, and

Defendant Wilson.

Plaintiff further claims that Wilson violated his Eighth Amendment rights, because Wilson allegedly "hired Virginia Mandac and failed to train her." ("Amendent [sic] Complaint," [Docket No. 10], p. 4, ¶ 8.) This claim is patently frivolous. The record shows that Wilson did not hire Corizon physicians such as Dr. Mandac, nor did she train them. (Wilson Aff., ¶ 10.) It is specious to suggest that a registered nurse, such as Defendant Wilson, violated Plaintiff's constitutional rights because she did not provide proper training to a licensed physician, such as Dr. Mandac. To the contrary, Wilson knew that Plaintiff was under Dr. Mandac's care, and Wilson reasonably expected Dr. Mandac to identify and treat Plaintiff's health care needs. As Wilson has explained:

> "At no time did I ever believe that [Plaintiff] was receiving inadequate medical care or that he had a serious undiagnosed medical condition. I am not a medical doctor and I relied on [Plaintiff's] physicians to explain his medical situation to me. When I spoke with [Plaintiff's health care] providers, their care and treatment decisions appeared reasonable to me."

(Wilson Aff., ¶ 9.) Plaintiff has presented no evidence to rebut this statement. Thus, the Court concludes that Plaintiff cannot sustain an Eighth Amendment Claim against Wilson.

### (ii) Claims Against Prison Administrators

The three remaining Defendants in this case – Tom Roy, Bruce Reiser, and Greg Smith – are not health care providers. As previously noted, Roy is the current Commissioner of the DOC, Reiser is a former warden at MCF-RC, and Smith is an assistant warden. Plaintiff broadly claims that these Defendants violated his Eighth Amendment rights, because they allegedly did "not provide adequate doctors at the Rush City facility," and did "not properly train the nurses whom they hire." (Complaint, p. 4, ¶ 18.) Plaintiff further claims that these Defendants "acted with deliberate indifference by

engaging in a policy and custom of inadequately funding and training employees at the Rush City Correctional facility."  (Id., p. 5, ¶ 25.)

Defendants Roy, Reiser and Smith contend that they did not violate Plaintiff's Eighth Amendment rights, because they reasonably relied on medical experts, (primarily Dr. Mandac), to address Plaintiff's medical concerns.[10]  This defense is entirely valid, because "[p]rison officials lacking medical expertise are entitled to rely on the opinions of medical staff" regarding the proper treatment of a prisoner's health care needs.  Holden v. Hirner, 663 F.3d 336, 343 (8th Cir. 2011).  See also Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995) (because prison administrators "lacked medical expertise, they cannot be liable for the medical staff's diagnostic decision" regarding a prisoner's medical treatment); Dowty

---

[10]  Tom Roy has stated:

"I am not a medical doctor... and I must rely on the medical opinions provided by my medical staff when addressing offender medical  concerns.  Prior to the filing of this lawsuit I was not personally aware of [Plaintiff's] medical concerns.  I have had no involvement in any decisions regarding his care and treatment."  (Declaration of Tom Roy, [Docket No. 69], ¶ 2.)

Bruce Reiser has stated:

"I am not a medical doctor...  I did not have authority to overturn treatment decisions made by physicians, to direct specific medical treatment or testing, or to order referrals to off-site specialists...  I deferred to the determinations of physicians and health services staff regarding what testing and treatment was medically necessary."  (Declaration of Bruce Reiser, [Docket No. 67], ¶ 3.)

Gregory Smith has stated:

"I am not a medical doctor and do not have medical training.  I, therefore, must defer to the explanations provided by medical staff regarding an offender's condition and the treatment required, if any."  (Declaration of Gregory Smith, [Docket No. 68], ¶ 2.)

v. Waukazoo, No. Civ. 11-3025-RAL, (D.S.D. 2012), 2012 WL 4903664 at *9 (sheriff "who is not a medical professional, is entitled to rely upon the opinions of those doctors who are actually treating and trained to treat inmates").

Defendants Roy, Reiser and Smith, who are <u>not</u> health care professionals, were entitled to rely on Dr. Mandac and other health care professionals at MCF-RC to determine how Plaintiff's health care needs should be handled. <u>See</u> <u>Drake ex rel. Cotton v. Koss</u>, 445 F.3d 1038, 1042 (8th Cir. 2006) ("it is not deliberate indifference when an official relies on the recommendations of a trained professional"). Deferring to a medical expert cannot constitute deliberate indifference to a prisoner's serious medical needs. <u>See</u> <u>Liscio v. Warren</u> 718 F.Supp. 1074, 1082 (D.Conn.1989) (prison official "cannot be found to have been deliberately indifferent to plaintiff's medical needs for failing to intervene in [treating physician's] course of treatment for the plaintiff;" prison officials "justifiably may defer to the medical expert regarding treatment of inmates/patients"), <u>rev. on other grounds</u>, 901 F.2d 274 (2nd Cir. 1990); <u>see</u> <u>also</u> <u>McEachern v. Civiletti</u>, 502 F.Supp. 532, 534 (N.D.Ill.1980) (deferring to the professional medical judgment of the doctors attending to a prisoner insulates prison officials from Eighth Amendment liability).

"A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions." <u>Meloy v. Bachmeier</u>, 302 F.3d 845, 849 (8th Cir. 2002), citing <u>Camberos</u>, <u>supra</u>. Indeed, "[p]rison officials cannot substitute their judgment for a medical professional's prescription." <u>Id</u>., citing <u>Zentmyer v. Kendall County</u>, 220 F.3d 805, 812 (7th Cir. 2000). If Defendants Roy, Reiser and Smith had <u>not</u> acted in accordance with medical staff recommendations, then they might have breached a duty owed to Plaintiff. However, the Court rejects the notion that prison administrators, who are

24

not health care providers, have a legal duty to independently evaluate a prisoner's health care needs, and treat those needs as they deem appropriate, regardless of what the prison medical staff has determined. Plaintiff has cited no legal authority to support such a notion, and the Court is not otherwise aware of any such authority. Thus, the Court concludes, as a matter of law, that Defendants Roy, Reiser and Smith did not violate Plaintiff's Eighth Amendment rights by failing to review and countermand the medical care decisions made by Dr. Mandac, Defendant Wilson, and other health care providers at MCF-RC.

The Court also rejects any claim that Defendants Roy, Reiser and Smith violated the Eighth Amendment by reason of any hiring decisions or any training policies. Any such claim is clearly baseless. The record plainly shows that neither Dr. Mandac nor Defendant Wilson, (or anyone else identified in Plaintiff's submissions), was hired by Roy, Reiser or Smith.[11] Furthermore, it is simply self-evident that non-medical prisoner administrators, such as Roy, Reiser and Smith, have no duty under the Eighth Amendment (or otherwise) to provide medical training to health care providers, such as Mandac and Wilson. In any event, Roy, Reiser and Smith, cannot be held liable under § 1983 for failing to supervise or train Mandac and Wilson, because it has already been determined that Mandac and Wilson did not violate Plaintiff's constitutional rights. See Gibson v. Weber, 433 F.3d 642, 647 (8th Cir. 2006) (prisoner who failed to establish that his medical care was constitutionally inadequate could not maintain a claim against prison administrators for failing to train prison's staff).

---

[11] Both Mandac and Wilson were already employed at MCF-RC before Roy became the DOC Commissioner in 2011. Reiser did not hire either Mandac or Wilson, nor did Smith. (Declaration of Bruce Reiser, [Docket No. 67], ¶ 5); Declaration of Gregory Smith, [Docket No. 67], ¶ 4.)

## V.  CONCLUSION

In sum, the Court finds that, given the facts shown by the present evidentiary record, no reasonable jury could conclude that any of the individual Defendants violated Plaintiff's constitutional rights under the Eighth Amendment.  Thus, the Court concludes that none of Plaintiff's § 1983 claims can survive Defendants' motions for summary judgment.[12]  The Court will therefore recommend that Defendants' respective motions be granted, and that this action be dismissed with prejudice.

Finally, the Court notes that Plaintiff has filed a motion asking that the Clerk of Court be directed to serve his response to Defendants' summary judgment motions.  (Docket No. 74.)  However, when Plaintiff filed his response to the summary judgment motions, Defendants were automatically notified of that filing by means of the Court's Case Management - Electronic Case Filing system, ("CM/ECF").  Defendants later filed replies to Plaintiff's response, (see Docket Nos. 76 and 77), which shows that they did receive the response.  The Court will therefore recommend that Plaintiff's pending motion for service by the Clerk of Court be denied as moot.


## VI. RECOMMENDATION

---

[12]  Having determined that none of Plaintiff's claims are sustainable, the Court will not specifically address Defendants' qualified immunity defenses.  See Holden, 663 F.3d at 343 ("[b]ecause we conclude Holden failed to demonstrate the deprivation of a constitutional right, we do not discuss further the prison officials' claim of qualified immunity"); Schmidt v. City of Bella Villa, 557 F.3d 564, 574 (8th Cir. 2009) ("[s]ince we find no constitutional violation, we need not address the issue[ ] of qualified immunity"); Price v. Larkins, No. 12-2652 (8th Cir. Feb. 27, 2013), 2013 WL 692748 (unpublished opinion) at *1 ("[b]ecause we agree with the court that the record does not establish an Eighth Amendment violation, we need not address the issue of qualified immunity").

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendants' respective motions for summary judgment, (Docket Nos. 44 and 59),

be **GRANTED**;

2. Plaintiff's pending "Motion For Clerk To Serve All Named Defendants Plaintiff's

Reply Brief," (Docket No. 74), be **DENIED AS MOOT**; and

3. This action be **DISMISSED WITH PREJUDICE**.


Dated: April 8, 2013

    *s/ Arthur J. Boylan*
    ARTHUR J. BOYLAN
    Chief United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before April 23, 2013.